IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

SEP 1 9 2000

CLERK

LUCILLE SANCHEZ,

    **Plaintiff,**

vs.

    Civ. No. 99-1231 LH/RLP

KENNETH S. APFEL, **Commissioner**
of Social Security,

    **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.    Plaintiff, Lucille Sanchez, (Plaintiff herein), filed applications for Disability Income Benefits (DIB) under Title II of the Social Security Act, and for Supplemental Security Income Benefits (SSI) under Title XVI of the Social Security Act. Her protective filing date was June 19, 1996. She was last insured for DIB benefits as of September 30, 1994. She contends that she has been disabled and unable to work since September 2, 1993, due to chronic fatigue syndrome, anxiety disorder, thyroiditis and depression. Her applications for benefits were denied at the first and second levels of administrative review. On November 21, 1997, an Administrative Law Judge (ALJ) found that she was not disabled on or before the date she was last insured for DIB benefits, but that she met the criteria for *per se* disability under Listing §12.04 (Affective Disorder) as of the date she applied SSI. (Tr. 15-30). The ALJ denied Plaintiff's claim for DIB and awarded SSI Benefits effective June 19, 1996. Plaintiff appealed the denial of DIB benefits to the Appeals Council, which declined to

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

12

review the ALJ's decision on September 16, 1999. (Tr. 6-7).  The matter now before this Court is Plaintiff's Motion to Reverse the decision of the Commissioner with regard to the denial of DIB benefits.

## I.    Standard of Review

2.     This Court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied.  **Castellano v. Secretary of Health & Human Services**, 26 F.3d 1027, 1028 (10th Cir.1994).   Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "  **Soliz v. Chater**, 82 F.3d 373, 375 (10th Cir.1996) (quoting **Richardson  v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).   In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole.  **Dollar v. Bowen**, 821 F.2d 530, 532 (10th Cir.1987).

3.     The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled.  **Reyes v. Bowen**, 845 F.2d 242, 243 (10th Cir.1988).   If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there.  **Sorenson v. Bowen**, 888 F.2d 706, 710 (10th Cir.1989).   The burden of proof is on the claimant through step four; then it shifts to the Commissioner.  **Id.**

## II.    Vocational and Medical Facts

4     Plaintiff was born on October 12, 1963.  (Tr. 81).  She attended school to the 10th grade.  Her past relevant work was as a day care provider and a part-time substitute home health care worker. (Tr.75).  Because Plaintiff's insured status expired on September 30, 1994, she had to establish a

2

disability existing as of that date in order to qualify for DIB. **Miller v. Chater**, 99 F.3d 972, 973 (10th Cir. 1996); **Potter v. Secretary of Health & Human Services**, 905 F.2d 1346, 1347 (10th Cir. 1990).

### A.   Plaintiff's Medical Condition Prior to the Date She Was Last Insured.

5.     Plaintiff complained of nervousness, anxiety and panic attacks for a two-three month period in 1992-1993. (Tr. 237-238). Her complaints resurfaced in the summer of 1993, during work up and surgical removal of a cancerous thyroid. (Tr. 119, 121, 127-134). She takes thyroid hormone replacement medication, and repeated testing indicate normal levels of thyroid hormone. (Tr. 116, 196, 209).

6.     As of 1994, Plaintiff obtained her medical care at Health Centers of Northern New Mexico (HCNNM). On April 19, 1994, she requested that her physician provide her with a note to exempt her from looking for a job. A physician's assistant, without conducting a physical exam, prepared a note which was countersigned by a physician. (Tr. 179-181). The noted stated: "Lucille had cancer surgery of (neck) her thyroid. She is on Synthroid 0.1 mg. one daily. She is still recovering from the physical and mental trauma of her surgery. She needs 2-3 more months to recover." (Tr. 179). A separate "Physician's Statement - Disability," also prepared by the physician's assistant and countersigned by a physician, stated that Plaintiff had been totally disabled from September 15, 1993, through November 15, 1993, had been able to perform light work duties thereafter, but was not fully recovered and "really needs more time . . . perhaps 2-3 months." (Tr. 180).

7.     Plaintiff's first physical evaluation at HCNNM was performed on May 12, 1994. The only abnormalities noted were a post surgical scar, hyper-pigmentation on her neck and acne. No functional limitations were recorded.(Tr. 176-178).

3

8.      Plaintiff suffered a miscarriage on June 26, 1994, and requested a tubal ligation several days later. (Tr. 138, 175). She was seen at HCNNM on July 28, 1994, reporting problems sleeping, feeling out of control and intermittent panic attacks. The care provider noted that Plaintiff exhibited pressured speech and anxiousness, and assessed Plaintiff as suffering from anxiety disorder, sleep disorder and depression. Plaintiff was referred to Vista del Sol counseling service (Tr. 173), but she did not follow up on the referral at that time.

        **B.      Plaintiff's Medical Condition After the Date She Was Last Insured.**

9.      Plaintiff was evaluated by Gary Moses, a nutritionist/naturopathic physician on or about October 19, 1994, two and one-half weeks after her insured status expired. (Tr. 171, 200). He ordered blood tests which were positive for the presence of Epstein-Barr virus. Plaintiff was evaluated at HCNNM on April 25, 1995. (Tr. 171). At that time, Plaintiff stated Mr. Moses had diagnosed her condition as Chronic Fatigue Syndrome. The personnel at HCNNM prepared a "Physician's Statement-Disability," which indicated that Plaintiff suffered from Chronic Fatigue Syndrome thyroid cancer, and was totally unable to perform any work as of April 25, 1995. (Tr. 172). The concurrent treatment note states "see copy of excuse for work for disability insurance in order to pay trailer payments." (Tr. 171).

10.     Plaintiff was evaluated by a physician at HCNNM on July 25, 1995. (Tr. 167-170). Based upon her complaints[2] and his evaluation[3], he arrived at a differential diagnosis of anxiety disorder

_____

[2]"31 yo female c/o worsening anxiety x 2 wks. Sleeping 3-4 hrs/night. Under "stress," tired, worried about health. Denies depression. Wants something to help her sleep." Thinks she is having "panic attacks." TX'd in past with Imipramine - didn't help. Xanax has helped. Denied ETOH Drug abuse. Also requesting letter stating she had "chronic fatigue syndrome" (saw naturopath in Albq --> lab --> high EBV titer x 1). (Tr. 169).

[3]"Anxious, appropriate, NAD (no acute distress), not examined. (Tr. 169)

with insomnia, personality disorder, malingering or CFIDS (Chronic Fatigue and Immune Dysfunction Syndrome). (Tr. 167). He prescribed a limited course of anti-anxiety drugs, Xanax and Buspar, both to be taken three times per day, and stated "I gave pt letter stating I am tx'ing her for anxiety disorder and I feel she is unable to work or seek employment until this problem is controlled. If pt feels she is permanently or indefinitely disabled she will need to undergo a disability evaluation application." **Id.**

11   Plaintiff was seen by a physician's assistant at HCNNM on August 29, 1995. She stated that she had taken Xanax at less than the prescribed dosage. Buspar was not mentioned in the treatment note. Plaintiff reported that she was able to sleep, but had episodes of crying and anxiety, nervousness, insomnia, feeling that she couldn't deal with anything, mood swings and anger. (Tr. 162). A disability claim form was prepared stating that Plaintiff suffered from anxiety disorder and was totally disabled. (Tr. 163). The physical examination form prepared at the time of this visit lists no clinical or laboratory findings related to Plaintiff's mental condition. (Tr. 164-165).

12.   On December 5, 1995, Plaintiff reported that her anxiety had "much improved" while on Xanax, that she was able to sleep and was less irritable. The physician evaluating her judged her to be more relaxed, well groomed, and in no acute distress. She was continued on Xanax.

13.   Plaintiff was next evaluated on February 27, 1996. She was taking Xanax four times per day and felt better. She had been working part time for Avon, and had lined up a job at a restaurant to start in two weeks. (Tr. 158). She also reported that she had not kept her appointment at Vista del Sol, because they wanted a $100 payment prior to being seen. Plaintiff's appointment at Vista del Sol was rescheduled, and she was told to obtain further prescriptions for Xanax from Vista del Sol. **Id.** She did not keep the appointment. (Tr. 158, 224). In April 1996, she obtained a refill of her

thyroid medication from HCNNM, but no additional Xanax. (Tr. 158).

**C.   Plaintiff's Medical Condition After the Date She Was Found Disabled.**

14.     Plaintiff was evaluated by Murray Ryan, M.D.,[4] on July 15, 1996, complaining of stress and insomnia. At her request, he renewed her prescription for Xanax, which she stated had helped (Tr. 153-4).

15.     Donald Fineberg, M.D.,[5] performed a consultative psychiatric examination on October 3, 1996. (Tr. 139-141). Plaintiff reported chronic fatigue and anxiety which prevented her from performing any regular activities, despite taking Xanax daily. She also stated that her symptoms, present for years, had become more severe over the last couple of years.   Dr. Fineberg performed a mental status examination, which indicated that Plaintiff was oriented, with unimpaired memory, judgment and ability to calculate. She had no underlying thought disorder, hallucinations or delusions. Her mood was subdued and occasionally tearful. Dr. Fineberg concluded that Plaintiff's chronic fatigue complaints were characterized more by anxiety than by depression or fatigue per se. He identified several factors contributing to her mental state, concluding that if she felt better physically, she would be able to work.

16.     Plaintiff was evaluated at Vista del Sol on December 12, 1996. (Tr. 217-218). Diagnostic testing indicated severe clinical depression and extreme anxiety or panic. Plaintiff did not remain long enough to complete her intake evaluation, and failed to appear at two follow up appointments.

17.     Plaintiff returned to Dr. Ryan on December 30, 1996. (Tr. 152). The handwritten portion of his note indicates that she complained of chronic fatigue, complete exhaustion, feeling spacy and

---

[4] Dr. Ryan in a board certified internist. (Tr. 233).

[5] Dr. Fineberg is board certified in psychiatry and neurology. (Tr. 235)

depression.   The typed portion of the note indicates that she stated that she was "doing pretty well,"
and that Dr. Ryan assessed her has "doing well enough."

18.     Plaintiff received psychiatric counseling and treatment at Rio Arriba Counseling Services
from April through September 1997. (Tr. 239-246).  Treatment notes record symptoms of insomnia,
anxiety, fatigue, depression, the belief that a prior physician had tried to kill her, as well as the use
of a variety of anti-depressant medications.

19.     Plaintiff was evaluated by John Lang, PhD., on July 3, 1997, almost three years after her
insured status expired.  (Tr. 225-230).   Dr. Lang described Plaintiff as difficult to interview and
unreliable. (Compare Tr. 226 with Tr. 96, 139-140).  She repeated her allegation that a doctor had
wanted to kill her, and had killed her baby.  She was distractable, with limited memory, poor
attention and concentration, suspicious, fidgety and edgy, with blunted affect and  minimally
compliant with testing activities.  Based on the testing and interview, Dr. Lang  diagnosed major
depressive disorder - recurrent, pain disorder with both psychological factors, a generalized medical
condition (Chronic Fatigue Syndrome) and mild mental retardation". He also stated that she was
"severely regressed from previous levels of function." (Tr. 228). He prepared a medical assessment
of ability to do work related activities - mental, indicating that she was not employable.  (Tr. 229-
230).  In a letter dated July 31, 1997, sent to Plaintiff's attorney, Dr. Lang stated:

> Last week you sent me a letter requesting written documentation that it is
> more likely than not that (Lucille Sanchez') present disabling condition existed prior
> to September 30, 1994.  Please be advised that her condition of Mild Mental

---

"Plaintiff's scores on the WAIS-R intelligence test administered by Dr. Lang were Verbal IQ of 52,
Performance IQ of 50 and Full Scale IQ of 45. Dr. Lang did not say that he found these results to be "valid."
Rather, he indicated that she provided minimal responses with inconsistent results, refused to perform a
portion of the test due to irrational fears and beliefs, and that based on prior achievement and activity levels,
she appeared to be severely regressed. (Tr. 227-228).

Retardation existed prior to September 30, 1994, and that her depression has
developed gradually over the last five or ten years.

(Tr. 231).

### III.   Analysis

20.   Relying on the 1997 testing by and retrospective opinion of Dr. Lang, Plaintiff contends that
the ALJ erred in failing to find that she met the criteria for *per se* disability for mental retardation
prior to the date she was last insured.  Plaintiff argues that the evidence establishes disability under
20 C.F.R. Pt. 404, Subpart P, App. 1, §12.05(B), 12.05(C) or 12.05(D).

21.   The introductory language of §12.05 states that "[m]ental retardation refers to a significantly
sub average general intellectual functioning <u>with deficits in adaptive behavior initially manifested
during the developmental period (before age 22)</u>." (emphasis added).    Plaintiff was 33 years old
when tested by Dr. Lang on July 3, 1997.   Nothing in her the administrative record indicates that
she exhibited deficits in adaptive behavior prior to age 22.[7]   In addition, the ALJ questioned the
validity of the WAIS-R scores, noting that Plaintiff had been minimally cooperative at the time of
testing. (Tr. 24).   He noted that at the prior evaluation by Dr. Fineberg, Plaintiff exhibited normal
orientation, memory, judgment, general cognition and ability to calculate, abilities she had lost by
the time of Dr. Lang's evaluation.

22.   The Tenth Circuit has "emphasize[d] that the ALJ need not simply accept IQ results reported
by an expert . . . By its own terms, 12.05C requires a valid IQ score, and '[t]he regulations do not
limit the question of validity to test results alone in isolation from other factors." ' **McKown v.**

_____

[7] The ALJ noted that Plaintiff "worked successfully as a day-care provider for a number of years.
She complained only sporadically of mental limitations prior to 1996, and was minimally compliant with
treatment recommendations.  When she did take medication, she responded quickly and positively.  She
raised a family of three children." (Tr. 25).

Shalala, 5 F.3d 546, 1993 WL 335788, **3 (10th Cir.1993)(attached), (quoting **Brown v. Secretary of HHS**, 948 F.2d 268 (6th Cir.1991). Accordingly, the ALJ may discount an IQ score as invalid for a variety of reasons, so long as there is substantial evidence in the record to support its conclusion. The court does not reevaluate the evidence of whether the psychologists or psychiatrists were justified in their conflicting findings. Hence, I find that the ALJ had substantial evidence to support his questioning of Plaintiff's IQ scores. I therefore conclude that the ALJ gave proper weight to the opinion of Dr. Lang, and that the Commissioner's finding that Plaintiff did not meet the criterial for *per se* disability pursuant to 20 C.F.R. Pt. 404, Subpt. P, App 1, §12.05 was supported by substantial evidence.

23      Plaintiff argues that the ALJ's determination of the date of onset of her disability was not supported by substantial evidence. I find that this argument has merit, in terms of evaluating the impact of Chronic Fatigue Syndrome.

24.      The date of onset of disability must be correctly established and supported by the evidence. **Easthouse v. Shalala**, 877 F. Supp. 561, 565 (D. Kan. 1995) **citing Spellman v. Shalala**, 1 F.3d 357, 361 (5th Cir. 1993). There are three prongs to the evaluation of date of onset: the claimant's *allegations, the claimant's work history and the medical evidence.* **Id.; SSR 83-20, West's Soc.Sec.Rptg.Serv.Rulings 1983-91**. In this case, Plaintiff alleged that disability began on or about September 2, 1993, when she states she was no longer able to work because of Chronic Fatigue Syndrome, anxiety disorder, thyroiditis and depression. Other than a brief stint selling Avon products, she has not worked since that date. The third prong, the medical evidence, is not as clear. If the medical evidence regarding date of onset is ambiguous, the date of onset must be inferred, and that inference must be based on informed judgment, after consulting with a medical adviser.

Easthouse v. Shalala, 877 F. Supp. at 565-566.  A medical advisor was not used in this case.
Rather, the ALJ discounted Plaintiff's diagnosis of Chronic Fatigue Syndrome, stating that the
diagnosis had been made by a non-physician in January 1995, and was unsupported by any clinical
or objective findings. (Tr. 18).  In so doing, the ALJ made  errors which require that this matter be
remanded for additional proceedings.  First, the diagnosis of Chronic Fatigue Syndrome was based,
in part, on objective laboratory findings confirming the presence of Epstien-Barr virus.[*]  (Tr. 200).
Second, the laboratory study was performed on October 19, 1994, within days of the date Plaintiff
was last insured for benefits under Title II, not in January 1995 as stated by the ALJ.  Third, the ALJ
failed to consider the Program Operations Manual System ("POMS") guidelines of Chronic Fatigue
Syndrome issued by the Social Security Administration in 1993.  The POMS policy states in
pertinent part:

> Chronic Fatigue Syndrome (CFS), previously known as Chronic Epstein-Barr Virus
> Syndrome, and also currently called Chronic Fatigue and Immune Dysfunction
> Syndrome, is a systemic disorder consisting of a complex of variable signs and
> symptoms which may vary in duration and severity.  The etiology and pathology of
> the disorder have not been established.  Although there are no generally accepted
> criteria for the diagnosis of cases of CFS, an operational concept is used by the
> medical community.  There is no specific treatment, and manifestations of the
> syndrome are treated symptomatically.
>
> CFS is characterized by the presence of persistent unexplained fatigue and by
> the chronicity of other symptoms.  The most prevalent symptoms include episodes
> of low-grade fever, myalgias, headache, painful lymph nodes, and problems with
> memory and concentration.  These symptoms fluctuate in frequency and severity and

---

[*]In 1999, the Social Security Administration issued SSR 99-2p, "Evaluating Cases Involving Chronic
Fatigue Syndrome (CFS)."  Although not applicable at the time the ALJ issued his decision, this Ruling was
in effect when the Appeals Council declined to review Plaintiff's claim.  (Tr. 6-8, 11-30, and Court
Transcript Index).  SSR 99-2p provides in part that specific laboratory findings, including "an elevated
antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen
equal to or greater than 1:640" establish the existence of a medically determinable impairment. 64 Fed. Reg.
23380 (April 30, 1999).

may be seen to continue over a period of many months. Physical examination may be within normal limits. Individual cases must be adjudicated on the basis of the totality of the evidence, including the clinical course from the onset of the illness, symptoms, signs, and laboratory findings. Consideration should be given to onset, duration, severity and residual functional capacity following the sequential evaluation process.

POMS § DI 24515.007 (1997).

25. The failure of the ALJ to consider the clinical evidence supporting Plaintiff's diagnosis of Chronic Fatigue Syndrome and to follow the applicable POMS guidelines (now superceded by SSR 99-2p) requires that this matter be remanded for additional proceedings consistent with the above cited authorities. This decision does not dictate a given outcome on remand. Rather, it assures that correct legal standards will be used in arriving at a decision based upon the facts. **Huston v. Bowen,** 838 F.2d 1125, 1132 (10th Cir. 1988).

26. I find it unnecessary to address the remainder of Plaintiff's claims of error.

## IV.    Recommendation

27. For these reasons, I recommend that this case be remanded to the Commissioner with instructions to conduct additional proceedings in order to:

A.   Evaluate the evidence related to Plaintiff's diagnosis of Chronic Fatigue Syndrome. That evaluation shall be made pursuant to the criteria set out in SSR 99-2p; and

B.   Determine the date onset of disability in light of that diagnosis. That determination must be made with the assistance of a medical advisor.

_____
**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**

11

For Plaintiff:        James A. Burke, Esq.

For Defendant:      Norman C. Bay, Esq.
                    Ray Hamilton, Esq.
                    Mary F. Lin, Esq.

5 F.3d 546 (Table)
Unpublished Disposition

Page 1

(Cite as: 5 F.3d 546, 1993 WL 335788 (10th Cir.(Okla.)))

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the publication and citation of unpublished opinions.)

United States Court of Appeals, Tenth Circuit.

**Darrell McKOWN, Plaintiff-Appellant,**
v.
**Donna E. SHALALA, Secretary of Health and Human Services, Defendant-Appellee.**

No. 93-7000.

Aug. 26, 1993.

ORDER AND JUDGMENT [FN1]

Before BALDOCK and KELLY, Circuit Judges, and CAUTHRON, [FN**] District Judge. [FN2]

**1 Plaintiff appeals from a district court order affirming the decision of the Secretary to deny his request for social security benefits. We review the Secretary's determination in light of the whole record to determine whether the findings are supported by substantial evidence and whether the Secretary applied correct legal standards." Pacheco v. Sullivan, 931 F.2d 695, 696 (10th Cir.1991).

Plaintiff claims a disability based on mild mental retardation, as evidenced by standardized intelligence testing, coupled with physical limitations and pain arising from various injuries suffered in the past several years. The administrative law judge (ALJ) considered these allegations and found plaintiff not disabled under the Secretary's five-step evaluative sequence. See Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir.1988)(describing steps in detail). Specifically, the ALJ found plaintiff (1)was not engaged in substantial gainful activity; (2)had a severe impairment; (3)did not, however, have a listed impairment; (4)could not perform past relevant work; but (5)retained the residual functional capacity to perform most medium, light, and sedentary work, enabling him to qualify for jobs confirmed by a vocational expert to exist in sufficient numbers to preclude disability. See App. II at 22, 66-70. For the reasons to follow, we reverse and remand for

additional, explicit findings at step three, with further development of the pertinent facts should the Secretary deem that necessary as well.

We emphasize at the outset the limited nature of our disagreement with the ALJ's lengthy and, in all but one respect, meticulous analysis of this case. Aside from the step-three problem discussed herein, the record contains substantial evidence to support the ALJ's conclusions throughout the rest of the evaluative sequence. However, because a conclusive determination of disability at any step is dispositive, regardless of the different standards involved at subsequent steps. See Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir.1992); 20 C.F.R. 404.1520(a), we cannot rely on the ALJ's finding of nondisability at step five to disregard a potentially dispositive error, favorable to the plaintiff at step three, see, e.g., Ruiz v. Heckler, 770 F.2d 408, 410 & n. 1 (11th Cir.1984)(step five determination reversed because of error at step three); see also Davis v. Shalala, 985 F.2d 528, 530-31, 534-35 (11th Cir.1993)(step four determination reversed because of error at step three).

The listing for mental retardation sets out four distinct ways to establish disability. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05A-D. Our focus here is on 12.05C, which addresses mild mental retardation and provides that disability is shown by satisfying two conditions: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other impairment imposing additional and significant work-related limitation of function." The ALJ did not address this regulation directly in his discussion of the evidence at step three, [FN3] though it applies to much of what he said. We consider the ALJ's analysis and the record pertinent to both conditions, in turn below.

**2 At the Secretary's direction, Dr. Elizabeth A. Rasmussen tested plaintiff's cognitive functioning and prepared a report. Using the Wechsler Adult Intelligence Scale-Revised, Dr. Rasmussen determined plaintiff's full scale IQ to be 68. App. II at 302. The reliability and validity of this score was supported by inclusion of subtest scores, see See See Rul. 85-81, Social Security Administration Rulings 1975-82, at 786 (1983), as well as by Dr. Rasmussen's independent testing of plaintiff's reading performance on the Wide Range Achievement Test-Revised, which reflected a fourth grade reading level. Id. at 302. Dr. Rasmussen expressly found these measures to be "representative of [plaintiff's] current functioning." Id at 301-302. Absent

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

5 F.3d 546 (Table)                                                                 Page 2
(Cite as: 5 F.3d 546, 1993 WL 335788, **2 (10th Cir.(Okla.)))

probative countervailing evidence, Dr. Rasmussen's findings would clearly establish the mental retardation component of 12.05C.

The ALJ appeared to disregard these objective results primarily because plaintiff "has graduated from high school and spent about two semesters in college." App. II at 68. However, while plaintiff affirmed his graduation from high school, he also testified that in his junior and senior years he took ungraded vo-tech electrical training, which he has not used since. Id. at 88, 107, 116-17. Furthermore, he stated that he did not take a single course in the two semesters he tried at junior college. Id. at 117. Significantly, Dr. Rasmussen noted plaintiff's educational history, but nevertheless concluded that the IQ results were a valid measure of plaintiff's cognitive aptitudes. Id. at 301-02. Without supporting evidence to the contrary, the ALJ cannot simply substitute his own "medical expertise" for that of a qualified expert. Kemp v. Bowen, 816 F.2d 1469, 1476 (10th Cir.1987); see also Twin Pines Coal Co. v. United States Dep't of Labor, 854 F.2d 1212, 1218 (10th Cir.1988). This is particularly true here, as the regulations specify "[t]he IQ test should be administered and interpreted by a psychologist or psychiatrist qualified by training and experience to perform such an evaluation." 12.00(D); see, e.g., Nieves v. Secretary of Health & Human Servs., 775 F.2d 12, 14 (1st Cir.1985)(Secretary erroneously discredited IQ scores supported by only medical evidence in record).

The same conclusion is true of the various daily activities the ALJ evidently considered inconsistent with plaintiff's IQ scores. See App. II at 68-69. Such basic matters as self-care and interpersonal cooperation are fully commensurate with the mild mental retardation addressed by 12.05C. [FN4] See Brown v. Secretary of Health & Human Servs., 948 F.2d 268, 270 (6th Cir.1991)(quoting entry for mild mental retardation in Diagnostic and Statistical Manual of Mental Disorders (3d ed.1987) and finding condition consistent with daily activities more extensive than plaintiff's) [FN5]; see also Nieves, 775 F.2d at 14 (past work as seamstress consistent with "mild form of retardation" contemplated in 12.05C, which, unlike 12.05A or 12.05B (IQ under 60), requires an additional impairment to establish disability). Again, Dr. Rasmussen knew of plaintiff's daily activities, but they did not alter her opinion regarding the validity of his test results. See App. II at 301-02.

[*3] Before addressing the second condition imposed in 12.05C, we emphasize that the ALJ need not simply accept IQ results reported by an expert. By its own terms, 12.05C requires a valid IQ score, and "[t]he regulations do not limit the question of validity to test results alone in isolation from other factors." Brown, 948 F.2d at 269. Accordingly, the ALJ may discount an IQ score as invalid for a variety of reasons, so long as there is substantial evidence in the record to support his conclusion. See, e.g., Muse v. Sullivan, 925 F.2d 785, 788-90 (5th Cir.1991); Hutsell v. Sullivan, 892 F.2d 747, 750-51 & n.4 (8th Cir.1989); Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir.1986). Here, however, the educational background and daily activities cited by the ALJ, which Dr. Rasmussen herself considered, are not sufficient to contradict an otherwise uncontraverted opinion of the validity of the scores obtained. We note that the ALJ could have ordered readministration of the IQ test, or obtained a second qualified opinion regarding the validity of the existing results, but elected to decide the matter on the record developed for the Secretary by Dr. Rasmussen. See Brown, 948 F.2d at 270. On remand, the Secretary may wish to consider whether one or both of these avenues should be pursued.

Once mental retardation is demonstrated, the additional impairment required to meet the 12.05C listing must be "more than slight or minimal," that is, it need not be "severe" in step two terms, but it is "disabling" under step five standards. See, e.g., Popp, 985 F.2d at 534-35; Fanning v. Bowen, 827 F.2d at 633 & n.3 (9th Cir.1987); Nieves, 775 F.2d at 14. Because of the manner in which the ALJ proceeded, we have no reviewable finding on this important issue. After passing over step three for the reasons discussed above, the ALJ determined (1) that plaintiff was unable to perform a whole category of work (heavy work) that included his prior occupation of driller's helper but would also require certain restrictions on lighter work, but (2) that plaintiff was still able to perform a sufficient number of jobs to preclude a finding of disability at step five. See App. II at 69-70. Neither of these determinations is dispositive of the step three issue. The first may reflect significant work-related impairment, but it does not adequately assess the degree of limitation attributable solely to the nonretardation component of plaintiff's condition. The second relates to a (step five) standard far more exclusive than that appropriate to 12.05C under the authorities cited above. In short, "[w]hether the ALJ would have considered [plaintiff's] other impairments to have more than a slight or minimal effect, within the meaning of our holding today, is unclear." Id. at 827 F.2d at 633-34.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

5 F.3d 546 (Table)                                                                Page 5

(Cite as: 5 F.3d 546, 1993 WL 335788, **3 (10th Cir.(Okla.)))

Accordingly, we remand this case to the Secretary for further consideration under the standards appropriate to 12.05C. See id. In this regard, we note that the Secretary may wish to develop the record regarding the emergence of plaintiff's intellectual limitations, as the Listings for mental retardation apply only to conditions initially manifested during the developmental period (before age 22)." 12.05. See, e.g., Brown, 948 F.2d at 271. But see Gant v. Sullivan, 773 F.Supp. 376, 381 (S.D. Fla.1991)(noting circuit courts' liberal construction of 12.05's early manifestation requirement, under which "claimant is not required to affirmatively prove that he was mentally retarded prior to reaching the age of twenty two [so long as] there was no evidence that claimant's IQ had changed").

*4 The judgment of the United States District Court for the Eastern District of Oklahoma is REVERSED, and the cause is REMANDED to the Secretary for further proceedings consistent with this order and judgment.

FN* This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3.

FN** Honorable Robin J. Cauthron, District Judge, United States District Court for the Western District of Oklahoma, sitting by designation.

FN2 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

FN3 Earlier in his decision, the ALJ quoted at length all of 12.05, along with some twenty pages of other material generally related to mental and nervous disorders, see App. II at 28-50 (12.05 quoted at 18-49), but this recitation was never made explicit when the ALJ recounted the evidence, id. at 55-58, and went through the sequential analysis, id. at 60-67. On the Psychiatric Review Technique Form, the ALJ marked "absent" opposite the 12.05C criteria without further comment. Id. at 72.

FN4 Citing Soc. Sec. Rul. 82-54, the Secretary argues "mental retardation must be manifested by severe mental and social incapacity as evidenced by marked dependence upon others for personal needs (e.g., washing, dressing), inability to understand the spoken word, inability to avoid physical danger (fire, automobiles, etc.), inability to follow simple directions, and an inability to read, write and perform simple calculations." Brief for appellee at 17-18. This passage, a quote from the ruling, is actually addressed to 12.05A, which deals with mental retardation so severe that standardized test results (and additional impairments) are not required. See Social Security Administration Rulings 1975-80 at 783-84. We are concerned here, in contrast, with a psychometrically diagnosed less severe form of retardation that, when coupled with an additional impairment, may satisfy the listing in 12.05C.

FN5 Unlike the claimant in Brown, plaintiff cannot make change, does not receive or visit friends, and does not do his own laundry and cleaning. See App. II at 100-09.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works